IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Mae Alice McGruder, | ) | |
| | ) | |
| Plaintiff, | ) | C/A NO.  3:06-418-CMC |
| | ) | |
| v. | ) | |
| | ) | **OPINION AND  ORDER** |
| Eaton Corporation Short Term | ) | |
| Disability Plan, | ) | |
| | ) | |
| Defendant. | ) | |
| —————————————————————— | ) | |

Through this action, Plaintiff, Mae Alice McGruder ("McGruder") seeks a determination that Defendant, the Eaton Corporation Short Term Disability Plan ("Plan"), abused its discretion when it denied her claim for short term disability benefits.  The matter is currently before the court for a determination on the merits based on the parties' written submissions. *See* Dkt No. 11 & 14 (leaving open whether McGruder would agree to disposition on the written record); Dkt No 16 (agreeing to resolution based on the joint stipulation and cross motions for judgment).

The parties filed cross-memoranda in support of judgment on August 31, 2006, as well as responsive memoranda on September 15, 2006. Dkt No. 19-20 & 23-24.  In addition, McGruder filed a notice of supplemental authority on September 6, 2006, and a corrective surreply on September 19, 2006.  Dkt No. 21 & 25.  These memoranda rely on the evidentiary record filed as Dkt No. 17 on July 31, 2006.

The matter is now before the court for final resolution on the merits.

For the reasons set forth below, the court finds that the Plan did not abuse its discretion in denying benefits.  The court, therefore, finds that Defendant is entitled to judgment in its favor on McGruder's claim for benefits.  The court declines, however, to award attorneys' fees to Defendant.

## APPLICABLE LAW AND STANDARD OF REVIEW

It is undisputed that the benefits at issue are provided under an employee benefit plan governed by the Employee Retirement Income and Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). McGruder's claim for benefits is, therefore, pursued solely under 29 U.S.C. § 1132(a)(1)(B).

It is also undisputed that the Plan's benefits determination is subject to an abuse of discretion standard of review. Under this standard, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have come to a different conclusion had it considered the matter independently. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)).

Numerous factors are considered in "determining the reasonableness of a fiduciary's discretionary decision." *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2001). These include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.*

As these criteria reveal, the plan language is the starting point. *Id.* ("[a]s with any interpretation of a contractual trust document, we begin by examining the language of the Plan").

2

This is because "ERISA demands adherence to the clear language of the employee benefit plan." *White v. Provident Life Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997). *See also Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000) ("Because ERISA plans are contractual documents, although regulated, their interpretation is 'governed by established principles of contract and trust law.' . . . As with other contractual provisions, courts construe the plan's terms without deferring to either party's interpretation." – quoting *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir.1996)).

## DECISION OF THE COURT

After examining the administrative record, joint stipulation, and parties' memoranda, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

## FINDINGS OF FACT

**A.      RELEVANT PLAN TERMS**

### <u>Substantive Terms</u>

**Covered Disability**

You will be considered to have a covered disability (see "Disabilities NOT Covered" in this booklet for certain exceptions) as long as you are unable to perform the essential duties of your regular position with the Company, or the duties of any suitable alternative position with the Company, due to illness or injury. The availability and suitability of alternative positions are determined by the Company, in its sole discretion.

**Medical Information**

Objective findings of a disability are necessary to substantiate the period of time your physician indicates you are unable to work because of your disability. Objective

findings are those that can be observed by your physician through objective means, not just from your description of the symptoms. Objective findings include:

• physical examination findings (functional impairment/capacity);
• diagnostic test results/imaging studies;
• diagnosis;
• X-ray results;
• observation of anatomical, physiological or psychological abnormalities; and
• medications and/or treatment plan.

AR p. 29.

### Procedural Terms

**Plan Interpretation**

The Plan Administrator shall have discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including, but not limited to, any disputed or doubtful terms. The Plan Administrator shall also have the power and discretion to determine all questions of fact and law arising in connection with the administration, interpretation and application of the Plan. Any and all determinations by the Plan Administrator shall be conclusive and binding on all persons, except to the extent reviewable by a court with jurisdiction under ERISA after giving effect to the time limits described in the "Claims Appeal Procedure" section of this SPD.

**B.      HISTORY OF THE CLAIM AND MEDICAL EVIDENCE**

Plaintiff, Mae Alice McGruder ("McGruder"), was born on May 19, 1965.  AR p. 58.[1]  She

began work for Eaton Corporation (hereinafter "Eaton") on April 18, 1996, and was, at all relevant

times, a participant in the Eaton Corporation Short Term Disability Plan ("Plan").  *Id.*

McGruder was an assembler for Eaton.  AR 55.  Her job duties required her to stand eight

hours a day.  AR p. 59.  She was frequently required to lift up to ten pounds and occasionally lift

eleven to twenty-five pounds.  AR p. 58.

---

[1]  The Administrative Record ("AR") may be found at Docket Number 17 and is referred to herein by the bates number of the relevant page of that document (*e.g.,* "AR pp. 12-13").

4

McGruder's first day absent from work for the purpose of the short term disability claim was November 19, 2004. AR pp. 55 & 58. Shortly before that date, McGruder was diagnosed as suffering from "reversible anterior wall ischemia super imposed on an element on breast attenuation." AR p. 119 (October 1, 2004 treadmill test results). Prior to receiving this diagnosis, McGruder had been suffering "exertional shortness of breath with anterior ischemia," as well as "difficult to control hypertension" and hypercholesterolemia. AR p. 121. McGruder was scheduled for and received a cardio catheterization and angioplasty. AR p. 29. [2]

McGruder, thereafter, reported residual difficulties which are the basis of her claim of disability. On January 3, 2005, McGruder's physician, Dr. Rosa M. Jimenez ("Dr. Jiminez"), completed a statement of disability in which she attested that McGruder had been disabled from the date she ceased working through the date of the form. AR p. 63. Dr. Jiminez indicated an anticipated return to work date of January 20, 2005 and listed McGruder's primary diagnoses as coronary artery disease and right femoral nerve irritation. AR p. 63.

On January 20, 2005, McGruder was seen by J.E. Carnes, M.D., a neurologist. The patient history reveals that McGruder reported the following difficulties: (1) her pain "increases with walking, but may occur while sleeping"; (2) the pain occurs in "anterior, medial thigh and medial aspect of right leg"; (3) "numbness occurs in bottom of right foot"; and (4) her entire leg feels weak, although she was " unable to describe specific task or muscle weakness." AR p. 67.

---

[2] The record does not contain the actual reports of these procedures. It appears, however, to be undisputed that the procedures were performed on McGruder . In any event, the central issue is not whether McGruder had these procedures but what lingering injuries she may have experienced as a result.

In addition, McGruder checked off all of the following as symptoms or conditions from which she was suffering: (1) leg or ankle swelling, (2) muscle weakness/tenderness, (3) chest pain or discomfort, (4) heat or cold spells, (5) generalized lack of energy, (6) dizziness/problems walking, (7) exercise intolerance, (8) chronic sinus problems, (9) headaches, (10) numbness/tingling sensation, and (11) nausea or vomiting. AR p. 69.

Dr. Carnes completed a detailed evaluation form, providing an "affirmative" check as to each of the following motor skills: "No drift of upper extremities and stands on heels and toes"; "Good strength in upper and lower extremities to specific muscle testing"; "No atrophy or fasciculations"; "no abnormal movements or tone change"; "no ataxia"; "gait unremarkable."

AR 67-68.

Dr. Carnes also prepared a written report, directed to Dr. Jimenez, which included the following information:

> [T]his patient is a 37-year-old female who presents with a chief complaint of numbness in her right leg following an angioplasty for an abnormal stress test. The patient describes the numbness as affecting her entire leg including the bottom of her foot. Her examination showed complaints of increased sensitivity to pinprick over the entire leg and *this does not really follow an anatomic description*. *She showed absolutely no weakness.*
>
> . . ., I elected to treat this patient with Gabitril. *I really could find no specific evidence of femoral neuropathy*. However, it is certainly possible that the patient could have some numbness following an angiogram as this is not an uncommon occurrence. Nevertheless, I see *no evidence of major nerve injury to this patient and I have told the patient that I do not see any reason why she should not be able to return to her usual activities*.

AR p. 70 (emphasis added).

Roughly a month later, on February 24, 2005, Dr. Jimenez provided a supplemental assessment to the Plan. On this form, Dr. Jiminez checked a block indicating that she was unable

6

to release McGruder to return to work. She also indicated that McGruder's next appointment was with a neurologist at MUSC, on March 29, 2005 and that she was last seen by Dr. Jiminez on February 9, 2005. AR 64. Under the block for work restrictions, Dr. Jiminez wrote "*Patient reports unable to sit or stand for any period of time.*" *Id.* In the physical examination section, Dr. Jiminez stated that McGruder had pain in her right leg with "antalgic gait following femoral nerve [injury or irritation]."

Dr. Jiminez does not mention Dr. Carnes' report, which indicated no problems with gait or otherwise, although it seems likely that she would have received his report well before her supplemental assessment was written and provided to the Plan.[3] Dr. Carnes' report was, however, provided to the Plan. *See* p. 87 (in-house reviewer report dated March 3, 2005 which discusses Dr. Carnes' report).

As indicated in Dr. Jiminez's February 24, 2005 report, McGruder was referred to a neurologist at MUSC for further evaluation. *See* AR pp. 94 & 118 (same report, reprinted on different dates). McGruder was seen by Dr. Paola Tumminello, M.D., Professor of Neurology, on March 29, 2005. AR p. 94. Dr. Tumminello's report reveals a misunderstanding as to Dr. Carnes' diagnosis and advice, as well as McGruder's disability status. Specifically, Dr. Tumminello states:

> [McGruder] went to a *neurologist in Columbia. He diagnosed her with damaged right femoral nerve and apparently he told her that there was nothing that could be*

---

[3] Dr. Carnes' report to Dr. Jiminez is dated January 21, 2005, over a month before Dr. Jiminez's supplemental assessment was provided to the Plan. Dr. Jiminez's supplemental assessment also refers to a medication which Dr. Carnes prescribed, further suggesting that she was aware of the report by this time. Likewise, the reference to the referral to MUSC suggests knowledge of Dr. Carnes' report, given that MUSC was providing a "second" opinion. Dr. Jiminez's report also states that she last saw McGruder on February 9, 2005. The brief handwritten notes from that date indicate that McGruder had "excellent BP" at that time and was advised "to keep [her] appointment [with] MUSC." AR p. 66.

*done and she needed some support and counseling, that she should go on disability* and that was pretty much all she could do. She cannot stand. She cannot sit. stockings bother her. On a scale of 0 to 10, pain is a 10 all day long. She cannot sleep. Nothing makes her better. Pain is burning in quality and stabbing. She has been given some Ambien but that has not helped. The neurologist has not offered anything else. . . . *The patient is on social security disability.*

AR p. 94.[4]

Dr. Tumminello's report concludes:

On neurological examination, there is clear tenderness of the right leg. She can barely put her weight on it. She stands and sits; she cannot stay put. The pain is definitely a huge issue.

IMPRESSION: Femoral nerve injury.

PLAN: Diagnosis, prognosis and plan were discussed at length with the patient. I think there is a lot that can be done for this patient. I understand that the damage is permanent, but she does not have to live like this. I cannot see how she can live like this. I will send her to pain management to have the femoral nerve injected and blocked. Also vascular surgery might want to see her to make sure that there is nothing wrong with the surgery itself. We are going to have an MRI of the pelvis and right inguinal canal, EMG nerve conduction velocity tests. We will start her on Neurontin 800 mg at bedtime, to be gradually increased to 800, 800 to 1600; Baclofen 20 mg 3 times a day; Ambien 10 mg at bedtime; and Ultram to be taken as needed. Side effects of all these drugs were extensively discussed. The patient will return to see me after testing will be completed.

AR p. 94.

--------

[4] It is not clear what information was provided to Dr. Tumminello regarding Dr. Carnes report or by whom. It is, however, clear from Dr. Carnes' written report that, contrary to what is suggested in Dr. Tumminello's report, Dr. Carnes found "no evidence of major nerve injury" and advised McGruder that she could "return to her usual activities." AR p. 70. Dr. Carnes also prescribed Gabitril and planned to see McGruder again "in three months, or sooner if problems arose," rather than advising her that "nothing . . . could be done" as suggested by Dr. Tumminello's report *Id.* & AR p. 94. Moreover, Dr. Carnes' report reveals that McGruder's primary complaint when she saw him was of numbness and some increased sensitivity to pin pricks (albeit not following "an anatomic distribution"), not of excruciating pain. AR p. 70. Likewise, there is no evidence that Plaintiff had been found disabled for Social Security purposes as stated in Dr. Tumminello's report..

8

There is no other document in the record which would indicate the form or extent of the referenced "neurological examination." It is, therefore, impossible to discern from this record the extent to which Dr. Tumminello's opinion was based on actual neurological examination as opposed to: (1) a clear misunderstanding of Dr. Carnes' diagnosis and McGruder's social security disability status; and (2) McGruder's subjective claims (including that her pain was a constant 10 on a scale of 1 to 10).

Dr. Tumminello ordered an MRI, and EMG testing. These tests ultimately proved to be normal, although this information was not available to Dr. Tumminello until some time in July. AR p. 117 (MRI–no abnormality of femoral nerve ), AR No. 122-23 (EMG – normal).

On April 4, 2005, Dr. Tumminello signed an attending physician's statement in which she stated that she was unable to release McGruder to return to work. Dr. Tumminello listed McGruder's clinical condition as femoral nerve injury and added a notation that she did not "know if [McGruder] will improve to the point to be able to return to work." AR p. 71.

McGruder underwent a functional capacity assessment on April 7, 2005 which concluded that she had the capacity to sit for one hour, stand for one to two hours, and walk short distances on a frequent basis for "3 to 4 hours." AR p. 72. The tester, however, concluded that the functional capacity assessment was "an invalid representation" of McGruder's "present physical capabilities." AR p. 81. The tester state that he based this conclusion on:

> consistencies and inconsistencies when interfacing grip dynamometer graphing, resistance dynamometer graphing, pulse variations, weights achieved, and selectivity of behaviors. The results identified in the Assessment and Functional Overview generally represent a manipulated effort by the client. Therefore, the levels identified within the Assessment do not represent a true safe capability level.

9

AR p. 81. Repeatedly throughout the Assessment, the tester noted that McGruder stopped or refused to begin certain tests making comments such as: the test was "too much" for her; she felt her "nerve crawling down my arm"; "you got the nerve in my leg going"; "I can't do it[–]I'll be back in Charleston [presumably meaning "at MUSC"] tomorrow"; "I won't be able to drive home"; and [if I do that] "my leg will get hot and I will have to leave here." AR p. 77-78.

Broadspire Services (hereinafter "Broadspire") is the third-party claims administrator for the Plan. It advised McGruder by letter dated April 26, 2005, that her short term disability benefits were approved from November 18, 2004, through April 20, 2005, but would be terminated effective April 21, 2005. AR pp. 90-91. Specifically referencing the limited materials provided by Dr. Tumminello and the Functional Capacity examination, it concluded that there "was insufficient documented medical evidence to support [McGruder's claimed] inability to perform [her] essential job functions [as] an Assembler." AR p. 90. As to Dr. Tumminello's records, Broadspire explained

> [Y]our physician failed to provide abnormal examination findings to support your inability to perform your essential job functions. An additional request was made to Dr. Tumminello for . . . objective medical evidence for review. To date, your physician has not responded to our request.

AR p. 90.

Before making this decision, Broadspire obtained a peer review by one of its in-house physicians, Tamara Bowman, M.D, who holds specialties in Internal Medicine and Endocrinology.[5] In her report, Dr. Bowman reveals that she called Dr. Jiminez and asked "if the claimant had any objective findings on neurological examination." Dr. Jiminez reportedly responded that she did not.

_____

[5]  Dr. Bowman's review was prepared before receipt of any documentation from Dr. Tumminello or the FCE. It does not, therefore, address either. Both are, however, addressed in the denial letter from Broadspire.

Dr. Bowman then states:

> I asked if the claimant is able to ambulate into the office, or if she required assistive
> devices, and [Dr. Jiminez] stated that the claimant is not using any ambulatory aids,
> but does have an antalgic gait. . . . I asked her if she thinks the claimant is able to
> perform her job at the present time, and she stated that she has given her patient the
> benefit of the doubt, as the patient has told her that she is in too much pain to work
> at the present time. However, Dr. Jimenez was unable to provide any objective
> neurologic examination findings to support the claimant having a significant
> functional deficit due to her symptoms.

AR p. 88.  Dr. Bowman also considered the report of Dr. Carnes who, she noted "could find no
specific evidence of femoral neuropathy."  She further noted that Dr. Carnes found no muscle
weakness during his examination and observed that McGruder's claimed increased sensitivity did
"not follow an anatomic distribution."  AR p. 87.

Dr. Bowman concluded her report as follows:

> [1.] In summary, the claimant underwent a cardiac catheterization and apparently, an
> angioplasty, on 12/02/04. There is no documentation of ongoing cardiac complaints
> or problems. There is no evidence of persistence myocardial ischemia, arrhythmias,
> or significantly decreased left ventricular systolic function. Although the claimant has
> had complaints of pain and numbness in her right leg following her angioplasty, there
> are no *objective* signs of weakness, and no signs of radiculopathy in the claimant. She
> has exhibited hyperesthesia; however, this has not been in a dermatomal distribution.
> There are not electrodiagnostic study abnormalities or radiographic findings
> documented. There are no documentation of joint deformity or effusion. The claimant
> is not requiring any assistive devices with ambulation.
>
> 2. There are *no objective clinical findings* documented to support any restrictions or
> limitations on the part of the claimant at the present time.
>
> 3. If additional medical information were to be submitted regarding this claim, then
> documentation of neurologic examination findings, electrodiagnostic studies, a report
> from the claimant's second neurological consultation, and evidence of any ongoing
> myocardial ischemia or other cardiac problems, would be most relevant.
>
> 4. Based on the provided medical documentation, there are *insufficient objective
> clinical findings* documented to support a level of functional impairment that would
> render the claimant unable to perform her own occupation, from the present time

11

through 03/09/05.

AR p. 88 (emphasis added).[6]

McGruder was invited to and did appeal. In support of her appeal, she submitted a May 27, 2005 letter from Dr. Jiminez which states as follows:

> To Whom It May Concern:
>
> I would like to medically certify that Mae McGruder has been incapacitated since her cardiac catheterization dated 12/04/04. Even though she is still under neurological evaluation, it was felt that the discomfort that keeps her in constant pain down her right femoral nerve was related to the techniques used during the surgical procedure itself. The patient is now under the care of a neurologist at MUSC in Charleston, Dr. Paolo Tumminello. She is undergoing further workup and evaluation, but should be considered disabled and incapacitated for work related duties from 12/04/04 through today's date 05/27/05 until Dr. Tumminello clears her. Any further questions or disability statements should be sent to his office.

AR p. 97.

McGruder also submitted medical test results including an EMG/nerve conduction study which demonstrated normal results and an MRI of the pelvis which was also normal. AR p. 122-23 & 117. She also provided a more recent report from Dr. Tumminello addressing a June 15, 2005 visit. In this report, Dr. Tumminello states that McGruder's "right leg feels numb and hot, and this goes up to the right arm. It starts from the leg and goes up. Even during her nerve conduction velocity study, the right leg was hot. The pain is severe in intensity, located to the right leg, front and back, constant, disabling and severe." AR p. 113. Dr. Tumminello does not, however, explain whether she is merely reciting symptoms reported by McGruder or whether any of the above statements are based on clinical observation.

---

[6] The critical issue in this case is whether the Plan applied the correct "objective evidence" standard as defined by the Plan.

On appeal, Broadspire had another in-house physician reviewer, Vaughn Cohan, M.D, a neurologist, consider McGruder's records. In his July 20, 2005 in-house peer review, Dr. Cohan noted the following difficulties with Dr. Tumminello's reports and opinion:

> **[Stating in reference to March 29, 2005 report]** Dr. Tumminello misunderstood the claimant's history when she reported that the claimant underwent a right femoral artery angioplasty. The correct history is that the claimant underwent coronary angioplasty via a right femoral access. Dr. Tumminello stated that on examination there was "clear tenderness of the right leg." There is no quantified nor anatomic description of the localization of this tenderness. Dr. Tumminello does not provide a description of sensory exam findings. She states that the claimant can "barely put her weight on it." However, she does not describe the claimant's muscle power or gait. She does indicate that the claimant is able to stand and sit although she does not stay put. Dr. Tumminello completes her description of the physical exam findings by stating that "the pain is definitely a huge issue." This description does not constitute a neurologic physical exam opinion that the claimant is unable to work.
>
> **[Stating in reference to later testing and reports]** Dr. Tumminello later reported that a pelvic MRI was performed and was within normal limits. She also later reported that electromyograpy and nerve conduction testing was done, but she did not have the results of that examination in her most recent report dated 6/15/05. Dr. Tumminello does not make mention of the obviously inconsistent and invalid Functional Capacity Evaluation which was done. Although she submitted an Attending Physician Statement indicating that she does not know whether the claimant will be able to return to work, . . . Dr. Tumminello does not provide objective documentation to support that opinion

AR p. 101. Dr. Cohan then states:

> [T]he documentation does not demonstrate objective evidence of an impairment of sufficient severity and/or intensity as to preclude [McGruder] from work. *One would certainly not anticipate global pain or hypesthesia in the entire right lower extremity as a result of a specific femoral nerve injury. There is no evidence of muscle impairment or reflex impairment which would be anticipated in the case of a direct femoral nerve injury.*
>
> The documentation submitted does not demonstrate *objective evidence* of an impairment for the claimant's own occupation from 4/21/2005. *Additional clinical documentation which would be helpful* in further consideration of the claim would be an *up-to-date quantified report of the claimant's neurological physical exam findings and a report of the claimant's EMG and nerve conduction testing.*

AR p. 101 (emphasis added).

13

On August 4, 2005, Broadspire issued a second denial letter upholding its decision to terminate McGruder's disability benefits effective April 21, 2005. Dkt No. 107-09. As required by ERISA and the terms of the plan, Broadspire again invited McGruder to appeal.

On October 13, 2005, McGruder once again appealed the denial of her claim stating:

I am appealing the denial of Short-term disability benefits, effective 4/20/05, based on the attached medical evidence. I have been diagnosed with Femoral Nerve Neuralgia. Enclosed please find a note from Dr. Paola F. Tumminello, clinical assistant Professor of Neurology. Also enclosed are copies of the Progress Notes from same doctor. I have enclosed a letter from Dr. Thomas A. Duc of Pain Associates of Charleston. In addition, please find attached a copy of my referral to Columbia Heart Clinic, P.A. based on my abnormal stress test.

*I am unable to perform my job duties due to the pain and nerve damage.* I am currently required to wear a TENS unit over the femoral neurovascular bundle.

Please reconsider the medical evidence in this case. I await your decision.

AR p. 112 (emphasis added).

McGruder also provided her own statement regarding her prescription medications and their side effects as follows:

To Whom It May Concern:

The following medication I am tak[ing] below sometimes makes me sleep a lot. They are the following: Ultram – 50 mg – as needed-4 times a day-make me sleep a lot, Diovan HCT – 160 mg-12.5-twice a day, Lopressor – 100 mg-twice a day, Syntest H.S. – 1 time a day, Ambiem – 10 mg – 1 at night, Baclofen – 20 mg-3 times a day-makes me sleep a lot, Pravachol – 40 mg-1 at night, Mycinex – 1 a day, Nexium – 1 at night, Neurotion – 3 times a day-makes me sleep a lot.

AR p. 124 (dated October 13, 2005).

McGruder also submitted statements from her physicians as follows.

Dr. Thomas Duc stated:

"Thank you for allowing us to participate in the care of Ms. Mae McGruder. As you well know, she suffers from femoral neuropathy with some components of complex

14

regional pain syndrome as well i.e. type I clips. She is complaining of 8-9/10 pain in the distribution mainly of her right anterior thigh today. In pursuit of treatment, we did perform injection therapy, which did give her an excellent transient local anesthetic effect. She has had . . . at least one injection in the past; however, she may require a series of injection therapy in order to treat her pain. I have also provided her with some Lidoderm patch and have cautioned her to continue with your medical management. We will give a trial of TENS unit over the femoral neurovascular bundle as well today.

She may be a candidate for spinal column stimulator therapy in the future. I provided her with a DVD to examine the possibility; however, due to her use we may want to continue with periodic injections and medical management for the next approximately 12 months depending on the patient's preference.

Again, thank you for allowing us to participate in this very nice patient's care.

AR p. 115 (dated September 29, 2005).

The Plan was also provided with the following statement from Dr. Duc:

This just serves as a conformational [sic] and followup letter on Ms. Mae McGruder. She suffers from a right lower extremity pain, probable complex regional pain syndrome secondary to a femoral artery catheterization for atherosclerotic coronary vascular disease. I concur with Dr. Tumminello's assessment that this patient is impaired from her previous occupation for the foreseeable future.

AR p. 116.

McGruder also submitted a September 14, 2005 report from Dr. Tumminello which

acknowledged the negative EMB and MRI reports but explained as follows:

*The fact that the EMG nerve conduction velocity test is normal is not unusual because it is very difficult to test the anterior femoral nerve. It is a very superficial nerve. The patient has the problem with being a little bit overweight, and that will make testing on her very, very difficult. Clinically, she has neuralgia, paresthetica.* She has pain in the distribution of the anterior femoral nerve, which is become quite refractory to treatment. I think that she will benefit from a posterior column stimulator. Dr. Duc suggested it, and I defer to his expertise in this matter. I also think that the patient because of the pain cannot work. She is disabled because of severe pain. She will return to see me p.r.n. because I have done all the workup I could do, but I think that she needs to continue to see Dr. Duc for pain management.

AR p. 114 (emphasis added).[7]

Broadspire submitted these materials to a third in-house reviewer, Ira Posner, M.D., who specializes in pain management and orthopedic surgery.   Dr. Posner was asked specific questions as follows:

> 1.      Based on the documentation, job description and peer to peer (when applicable), does the information support a functional impairment from 4/21/05 through present?
>
> 2.      What restrictions and limitations are reasonable and are they temporary or permanent?
>
> 3.      What type of additional clinical documentation would be helpful for the evaluation of this claim?
>
> 4.      Other:    PLEASE   ADDRESS   THE   IMPACT   OF CLAIMANT'S PRESCRIBED MEDICATIONS MAY HAVE ON HER FUNCTIONALITY."

AR p. 127.  In his summary response, Dr. Posner stated:

> A1:    Fails to support [disability] from own occupation which is light to medium.
>
> A2:    No specific restrictions are needed for this individual.
>
> A3:    Current detailed orthopedic and neurological evaluation would be appropriate for further evaluation of this claim.
>
> A4:    Prescribed medications include Ultram, Diazin, Lopressor, Syntest, Ambien, Baclofen, Pravachol, Mucinex, Nexium, and Neurotonin. *None of these medications should have any significant systemic side effects that would preclude this individual from participating in work activity at her usual job.*

AR pp. 127-28.

In addition to these summary responses, Dr. Posner explained the basis for his conclusion, summarizing the available medical evidence as follows:

---

[7] "Neuralgia" is defined as "pain along the course of a nerve.. *See* www.medterms.com. "Paresthetica" is defined as "numbness, tingling, or pain along the outer thigh." *See* www.answers.com.

Ms. McGruder is a 40-year-old individual who underwent right femoral artery catheterization for a cardiac catheterization on 12/2/2004. *She probably suffered an injury to the lateral femoral cutaneous nerve, but had a very abnormal pattern of numbness involving her entire right lower extremity. Repeated physical examinations by multiple examining physicians did not show evidence of a functional or neurological deficit that would have precluded Ms. McGruder from returning to her regular work occupation at the light-to-medium level. She is on multiple medications including Ultram, Baclofen, and Neurontin, which should not present any difficulty in terms of functional activity if taken long term. There is no evidence of formal cognitive testing that shows any evidence of any deficit that would prevent this individual from returning to her regular work occupation.* Based on the current documentation, this individual has a injury to the lateral femoral cutaneous nerve with a concomitant chronic nonmalignant pain syndrome involving her right lower extremity. *Repeated examinations, however, do not show evidence of a functional impairment or neurological deficit that would preclude her from participating in her regular work activity at the light-to-medium level.*

AR 129 (emphasis added).

The Plan also procured an anonymous opinion from a third party:Medical Review Institute

of America, Inc. (MRIoA).  AR pp. 50-54.  The MRIoA reviewer concluded, in pertinent part, that:

The provided clinical notes do not meet the list of criteria to establish a diagnosis of CRPS [apparently referring to "chronic regional pain syndrome"].  The documentation of physical examination at initial evaluation, and in subsequent visits to the treating Neurologist and Pain specialist is sparse at best, and is described essentially in its entirety in the narrative above. Specifically,

Conclusion:

The patient is not disabled from her own profession after 4/20/05.

Applicable Clinical or Scientific Criteria or Guidelines in Arriving at Decision:

The provided *clinical materials do not provide confirmatory support for a diagnosis that would explain the patients reported disability* as of 4/20/05. Specifically, although the patient meets some of the diagnostic characteristics of CRPS a diagnosis of CRPS has not been established using IASP criteria. If a clear diagnosis of CRPS was established, evaluation of functional impairment in light of this diagnosis would be appropriate. The American Academy of Disability Evaluating Physicians (AADEP) have established consensus guidelines for functional criteria to assess severity of CRPS and its resultant disability, based on expert opinion and the

17

American Medical Association Guide to the Evaluation of Permanent Impairment, Fifth Addition[sic]. The vast majority of patients with CRPS can return to normal function, and development of a realistic plan for rehabilitation to employability would be necessary if CRPS was diagnosed. There is no evidence that the treating physicians have considered or prescribed functional or workplace rehabilitation strategies or work hardening.

AR p. 52-53 (emphasis added).  This reviewer did not consider the side effects of prescription medications.

On January 17, 2006, the Plan issued its final denial letter. AR 40-49.  This ten page denial letter details the process followed and evidence considered, concluding as follows:

The determination to deny Ms. McGruder's appeal and entitlement to continued short term disability benefits under the Disability Plan is based on the definition of disability in the Short Term Disability Program, the *need for objective, clinical medical findings to support a finding of disability*, a review of Ms. McGruder's medical records, and the conclusion of the independent medical professionals retained by the Plan Administrator to assist in making this determination.

Ms. McGruder's medical records reflect that she had a cardiac catheterization after a positive stress test and has suffered pain and numbness on the right side. The *pain and numbness is believed to be femoral nerve injury. However*, *the medical records do not support a finding of disability.*

None of the records provide *objective evidence of Ms. McGruder's inability to perform her job.* While Drs. Jimenez and Tumminello opine that Ms. McGruder is unable to work due to pain, neither physician provided any *objective clinical evidence to support the opinions*. Dr. Carnes previously indicated he could find no specific evidence of femoral neuropathy or major nerve injury. He indicated he saw no reason Ms. McGruder should not be able to return to her usual activities.

Nerve conduction studies/EMG and MRIs were reported as normal. A functional capacity assessment reflected an invalid representation of Ms. McGruder's physical capacities and a manipulated effort.

Further, each medical reviewer of Ms. McGruder's information concluded that the objective information did not support a finding that Ms. McGruder was unable to perform her occupation. The independent medical reviewer retained by the Plan Administrator concluded that, based on the available medical information, Ms. McGruder would not be unable to perform her occupation after April 20, 2005. (The

independent reviewers will be identified upon written request). The independent medical reviewer's conclusion was based on his review of the medical records.

The Plan Administrator's determination as described in this Action afforded no deference to the initial adverse benefit determination or to the Claims Administrator's denial of the first level appeal regarding Ms. McGruder's claim for continued short term disability benefits under the Disability Plan.

AR p. 48 (emphasis added).

This litigation followed.

## CONCLUSIONS OF LAW

McGruder's evidence of disability is, at best, equivocal. The detailed report of Dr. Carnes, the first neurologist consulted by McGruder, finds no objective evidence to support McGruder's claim of disabling pain and recommends releasing McGruder to resume her regular activities. Moreover, Dr. Carnes' objective findings (that the claimed sensitivity did not follow anatomical pattern) can fairly be read to support the conclusion that McGruder was exaggerating her symptoms.

In recommending that McGruder be continued on disability, Dr. Jiminez clearly elected to disregard Dr. Carnes opinion. She conceded in a telephone conference with an in-house reviewer that she did so based solely on McGruder's subjective complaints of disabling pain as to which Dr. Jiminez gave McGruder "the benefit of the doubt."

Dr. Tumminello's report of her initial examination of McGruder is fraught with false assumptions regarding Dr. Carnes' diagnosis and advice, as well as McGruder's disability status.[8]

_____

[8] McGruder repeatedly challenges references by the Plan and its reviewers to the need for an updated detailed neurological examination. McGruder suggests that these requests were unreasonable because Dr. Tumminello performed such an examination on March 29, 2005. This argument ignores both the absence of any evidence that a neurological examination was actually conducted and the obvious false assumptions which appear to form the basis of the March 29, 2005 report.

19

Dr. Tumminello also appears to rely exclusively on McGruder's subjective complaints of constant excruciating pain (a constant ten on a one to ten scale).[9]

There is no evidence of any specific clinical observations of any kind by Dr. Tumminello. While she does indicate, in her second report, that a neurological exam was performed and is evidenced by handwritten notes, those notes do not appear in the record. The only suggestion of any possible objective finding is a reference to McGruder's leg feeling "hot." This reference is found in the second report and, in context, is as likely a symptom reported by McGruder as anything observed by Dr. Tumminello.[10] What objective evidence is available from Dr. Tumminello relates to the negative MRI and EMG tests. While these results may not preclude a finding of disability, they certainly do not support it.

The FCE, by contrast, fully supports the conclusion that McGruder was exaggerating her symptoms and attempting to manipulate the various medical reports and tests in order to obtain benefits. This conclusion is also supported by Dr. Carnes' report that McGruder's claimed sensitivity and numbness did not follow an anatomical pattern. AR pp. 68 & 70. Under these circumstances, the Plan could reasonably question any conclusions by medical professionals if those conclusions rely primarily (or solely) on McGruder's subjective reports of pain.

The reports of Dr. Duc relate to attempted pain management. There is nothing in them which would establish the veracity of McGruder's claims of disabling pain. Rather, the degree of pain reported appears to be based solely on McGruder's subjective reports as accepted by Dr. Tumminello.

_____

[9] By contrast, McGruder appears to have focused on numbness with some associated pain when she was examined by Dr. Carnes.

[10] The reference to McGruder's leg feeling hot is found in a series of symptoms, most of which are clearly from McGruder's self report (including claims of pain and numbness).

3:06-cv-00418-CMC    Date Filed 10/23/06    Entry Number 27    Page 21 of 22

The various medical reviewers utilized by Broadspire (three in-house and one anonymous third party reviewer)[11] provided detailed explanations for their recommendations. The court finds those explanations to be credible and consistent with substantial evidence. Critically, these reports specifically address Plaintiff's claims of disabling pain and side effects of medication.

The court specifically finds the basis for the denial of benefits to be reasonable and based on substantial evidence in light of the requirement for "objective" evidence of disability which is defined by the Plan as follows:

> Objective findings of a disability are necessary to substantiate the period of time your physician indicates you are unable to work because of your disability. *Objective findings are those that can be observed by your physician through objective means, not just from your description of the symptoms*. Objective findings include:
>
> • physical examination findings (functional impairment/capacity);
> • diagnostic test results/imaging studies;
> • diagnosis;
> • X-ray results;
> • observation of anatomical, physiological or psychological abnormalities; and
> • medications and/or treatment plan.

AR p. 29.

In light of the factual support for the Plan's ultimate conclusion, its consistency with Plan language quoted above, and the process followed in reaching the decision, and in light of the

---

[11] Citing *Robinson v. Aetna Life Insurance Company*, 443 F.3d 389 (5th Cir. 2006), McGruder suggests that it was improper for the Plan to use an anonymous reviewer. In *Robinson,* the Fifth Circuit held that an ERISA plan administrator violated ERISA regulations when it failed to disclose the identity of experts on whose advice it relied in denying a claim for benefits. McGruder does not, however, suggest that she sought and was denied the identity of the reviewer. Neither does she challenge Defendant's assertion that her counsel was aware that the information would be revealed if requested. For these reasons and because Defendant had adequate support for its decision to deny benefits even without the MRIoA review, the court finds any failure to reveal the identity of the reviewer to be harmless.

21

applicable standard of review, the court concludes that the decision was consistent with the

procedural and substantive requirements of ERISA and not an abuse of discretion.

### FINDINGS AND CONCLUSIONS RELATIVE TO ATTORNEYS FEES

The parties are in clearly disparate positions regarding their ability to pay attorneys' fees.

While ultimately unsuccessful, McGruder's position was not unreasonable.  Further, there

is no evidence of bad faith or litigation tactics on McGruder's part which might have added

unnecessarily to the expense of litigation.

Under these circumstances, the court concludes that an award of attorneys' fees against

McGruder is not warranted.

### CONCLUSION

For the reasons set forth above, the court directs entry of judgment in favor of Defendant

but declines to award attorneys' fees.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
October 23, 2006

C:\temp\notesB0AA3C\06-418 McGruder -- meritsorder.wpd

22